FILED
CLERK

10:23 am, Sep 26, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
MERYL PORTER,

                          Plaintiff,

          -against-

HALF HOLLOW HILLS CENTRAL
SCHOOL DISTRICT and MILTON STRONG,

                          Defendants.
---------------------------------------------------------X

**MEMORANDUM AND ORDER**

17-CV-5006 (SJF) (ARL)

FEUERSTEIN, District Judge:

Plaintiff Meryl Porter ("Plaintiff" or "Porter") brings this action against Defendants the Half Hollow Hills Central School District and Milton Strong ("Strong") (collectively the "District") alleging claims pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*   Currently before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Motion, Docket Entry ("DE") [27].  For the reasons that follow, Defendants' motion is granted.

# I. BACKGROUND

## A. Factual Allegations

The facts alleged in the amended complaint ("AC"), DE [17-7], are assumed to be true for purposes of this motion.   The District is a public school district located Dix Hills, Suffolk County, New York, and Strong is the principal of West Hollow Middle School ("West Hollow"), a school in the District.  Porter is a fifty-five (55) year old woman of African American descent who, at all relevant times, was employed by the District.  She began work in the District as a reading specialist in 2001, and her primary responsibility "was to improve the reading ability of

students whose reading scores fall below the federally mandated level for its corresponding grade, as dictated by Title I, which is a federally mandated program." AC ¶16. At all relevant times, Porter worked at West Hollow and Strong was her "direct supervisor." *Id.* ¶17.

In or around 2012, the District, due to "financial hardships as a result of decreasing enrollment," made various changes including, *inter alia,* reducing the middle school class periods from nine (9) per day to eight (8). AC ¶18. Title I educational support programs were reduced from daily programs to weekly programs and the Title I educational support reading program became a "pull out" program where a student would need to forego another academic class in order to attend the reading class. *Id.*

The amended complaint alleges that as a result of these changes, students of means received private tutoring while "many students were left stranded without necessary – and federally mandated, academic support." AC ¶19. Porter "firmly believed" that this approach violated Title I and, "with over thirty (30) years of experience and expertise guiding her opinion," she began to voice her concerns and complaints about the pull out program "in both her capacity as a teacher and as a citizen and resident taxpayer of the district." *Id.* ¶19. Her concerns and complaints regarding the changes went unheeded and Strong began to retaliate against her. When she complained to Strong that the scheduling resulted in little direct student contact, she was told to "'just accept' it." *Id.* ¶20.

According to Porter, students were instructed to attend reading classes, but were not mandated to do so, and if they chose to attend, they would have to miss another class and/or lunch. This created undue stress on the students who, as middle school students, are "not very compliant." AC ¶23. She further "firmly believed" that this arrangement "pitted teachers against each other, as each educator had to fight for enough students to attend their [sic] classes."

*Id.* The "double booking" of classes, falling enrollment, and threats of reducing or eliminating classes "caused a hostile work environment of fear and trepidation amongst the teachers in the District." *Id.*

In or around June 2015, Porter was required to write a "reflective statement" responding to a prompt issued by the District. As in other years, there was a cover letter to staff from the principal reminding them to be reflective and not simply list actions taken during the past school year. Porter's statement reflected her actions and experiences from the 2014-15 school year. In the statement, Porter volunteered to participate in the Middle School Task Force to address problems associated with the curriculum changes in the middle schools. Her statement also clearly stated her opinion that "double booking" classes violated the law and that reading programs are federally mandated, not elective. AC ¶24.

Porter's annual statement also included other suggestions including volunteering to create a student list, create a better schedule, generate letters to parents, and other tasks. Strong "decided to ignore" her suggestions, instead focusing on one unspecified line in her statement, and wrote a "long summary 'cautioning' Porter regarding her word choice" which he placed in her personnel file "in an attempt to both silence and intimidate her." AC ¶27. Strong also failed to acknowledge Porter's accomplishments and "even went so far as to in his report, praise the work and projects of Porter's Caucasian colleague's work, even though all of the accomplishments he praised were actually completed by Porter." *Id.* ¶28.

Porter is also a resident in the District since 2007, and both of children "attend school in the district." AC ¶16. She was a member of the Mother's Club of Wheatley Heights for over forty (40) years, and as a member, expressed her view to the group "which in turn lobbied the District expressing Porter's views." *Id.* ¶22. She alleges, upon information and belief, that

Strong "knew those views came from Porter and retaliated against her for those views." *Id.* She generally alleges, again upon information and belief, that "the District was aware of Porter's involvement in local civic groups and her efforts to further her ideas via those groups and the District therefore sought to retaliate against her for those." *Id.* ¶27.

Porter claims that the District "privileged" jobs of well-connected teachers and offers the example that upon absorbing the Reading Department into the Special Education Department, reading teachers "were being told to work with special education students despite the fact that many of those teachers were not appropriately certified." AC ¶25. Porter had been certified for thirty-two (32) years and was certified in reading, special education, and elementary education. She alleges that, upon information and belief, "it is the custom and practice of the District to favor younger Caucasian teachers instead of their older counterparts." *Id.* ¶26. She states that despite her experience and being listed "towards the top of the seniority list," she was "continually passed over in favor of younger, Caucasian, and more well-connected teachers who are neither as senior as Porter nor similarly certified." *Id.* She identifies three specific teachers who, she alleges upon information and belief, were "repeatedly pushed ahead of Porter despite Porter having seniority over them." *Id.*

According to Porter, the District's discriminatory treatment of her continued though the 2015-16 school year. In or around April 2016, Porter was informed by the assistant superintendent, John O'Farrell, that she was to be transferred to another school in the District. She alleges that this transfer decision came "after none of her colleagues 'volunteered' for the position, despite the fact that [Porter] had seniority and the requisite certifications, and should not have been the individual chosen to involuntarily change work roles." AC ¶29. Before the transfer became effective, Porter was notified in or around June 2016 by some unspecified

person that she would now hold a "split" position between two buildings. She characterizes the move as a demotion, noting that the assignment had been forced upon her, and not her younger, Caucasian colleagues. She concludes that, upon information and belief, "the unwanted assignment was a positional demotion and in further retaliation for expressing her good faith complaints and concerns." *Id.*

In June 2016, Porter notified the District of her retirement. She claims that the retirement was unwanted, and that she was forced to take this action "[b]ecause of the ongoing and continuous maltreatment and unwanted alteration in her essential job functions." AC ¶30.

**B. Procedural History**

Plaintiff's complaint was filed on August 24, 2017 and alleges claims for relief under the ADEA, Title VII, 42 U.S.C. §1981, 42 U.S.C. §1983, and NYSHRL §290. Defendants filed a promotion conference letter providing the basis for their anticipated motion to dismiss including, *inter alia,* that Porter's first amendment claim fails as a matter of law, that the race claim must be dismissed for failure to exhaust administrative remedies, that she failed to allege an adverse employment action to support her claims, and failed to state an equal protection claim. Defendants' Letter of 9/29/17, DE [6]. Plaintiff did not respond to Defendants' letter and a briefing schedule was set.

Upon service of Defendants' papers in support of their dismissal motion, Plaintiff sought permission to amend her complaint to include allegations that would establish that her race discrimination claims had been exhausted administratively. Plaintiff's Letter of 1/8/18, DE [10]. She did not seek to amend her complaint to address any of the other deficiencies identified by Defendants in their motion to dismiss. This Court granted Plaintiff's request to amend, over

Defendants' opposition, on June 26, 2018, and the amended complaint was deemed filed.[1] Defendants subsequently renewed their motion to dismiss.

## II. LEGAL STANDARDS

Defendants seek dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The standards for analyzing a motion to dismiss are well-established. The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff. *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted). The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S at 679. A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-679; *see also Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation of cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level."). While Rule 8 does not require "detailed factual allegations," it does

---

[1] The matter, which had originally been assigned to District Judge Leonard D. Wexler, was reassigned to this Court on April 5, 2018.

require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678

(citing *Twombly,* 550 U.S. at 555).

## III. DISCUSSION

### A. First Amendment Retaliation

Porter asserts a §1983 claim that Defendants retaliated against her for exercising her right

to free speech under the First Amendment.[2]  "To plead a First Amendment retaliation claim a

plaintiff must show: (1) [s]he has a right protected by the First Amendment; (2) the defendant's

actions were motivated or substantially caused by [her] exercise of that right; and (3) the

defendant's actions caused [her] some injury." *Dorsett v. Cty. of Nassau,* 732 F.3d 157, 160 (2d

Cir. 2013).  Porter has not adequately pled that her speech was entitled to First Amendment

protection.

The Supreme Court instructs that "when public employees make statements pursuant to

their official duties, the employees are not speaking as citizens for First Amendment purposes,

and the Constitution does not insulate their communications from employer discipline." *Garcetti

v. Ceballo*s, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). "When a public

employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to

speech by citizens who are not government employees." *Id.* at 424.  On the other hand, the

making of public statements, writing letters to the newspaper, or discussing politics with a co-

worker are examples of activities that "retain some possibility of First Amendment protection" as

---

[2] The paragraph setting forth her Fourth Cause of Action for First Amendment retaliation states that Defendants retaliated against her "due to her constitutionally protected activities in free assembly, pursuant to the First Amendment." AC ¶39.   There is no mention in the rest of the complaint or in Plaintiff's opposition papers of a purported free assembly claim and thus the Court addresses this claim as asserting a violation of her free speech rights.

they are the same kind of activities "engaged in by citizens who do not work for the government."  *Id.* at 423 (citations omitted).  Accordingly, to state a plausible claim, Porter must allege facts that plausibly show that she was speaking as a "citizen" rather than as a public employee, and that she was speaking on a matter of public concern.  "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.' "  *See Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir. 2009)  (quoting *Garcetti*, 547 U.S. at 418).  Assuming *arguendo* that Porter's complaints regarding the District's failure to comply with federal mandates addressed a matter of public concern, the amended complaint fails to plausibly allege that those complaints were made by her as a citizen rather than a public employee.

Determination of whether speech is made as a public employee rather than a citizen requires examination of the particular circumstances of the case.  The inquiry is a practical one, and there is no brightline rule to be applied.  Courts examine "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two" as well as "whether the complaint was also conveyed to the public."  *Ross v. Breslin,* 693 F.3d 300, 306 (2d Cir. 2012).  Here, Plaintiff points to the complaints she made in her annual statement in June 2015.  This statement was clearly prepared within the parameters of her job, was not intended for public consumption, and indeed, there is no allegation that the statement was made public. Generally, "the First Amendment does not shield work environment correspondence."  *White v. City of N.Y.,* No. 13 Civ. 7156, 2014 WL 4357466, at *9 (S.D.N.Y. Sept. 3, 2014).  The amended complaint includes only conclusory allegations of other complaints she lodged.  For example, she "made the District aware" of her concerns regarding double booking, *see* AC ¶23, but there

is no suggestion as to when these complaints were made, how they were communicated, or to whom. As she was a reading specialist and the alleged complaints were made to the District regarding changes to the reading program, the only inference that can be plausibly made from the amended complaint is that her complaints were made within the performance of her duties as a public employee.

The amended complaint includes a few allegations that attempt to establish that Porter also spoke as a citizen such as that she lives in the District and has children that attended District schools. There is no allegation that her children were directly affected by the programming changes to the reading program, and the mere fact that she was a taxpaying citizen does not establish a plausible claim that her speech arose from that role. If such an allegation were sufficient, then any taxpaying public employee could claim that any and all speech related to her work is entitled to constitutional protection.

Porter also points to her longtime membership in the Women's Club, but provides only a short string of conclusory allegations that (a) she voiced her complaints to them, (b) the group "lobbied the District expressing" her views, and (c) Strong "knew" she was the source of those views. AC ¶22. As is the case throughout the amended complaint, she fails to allege when she made the statements to the Club, the content of those statements, how those concerns were passed on to the District by the Club, or how Strong knew she was the original source of the concerns. Drawing all inferences in Plaintiff's favor, she has alleged a tenuous chain of events unsupported by any factual content that would raise the claim from implausible to plausible. Additionally, the amended complaint fails to plausibly allege that any speech she engaged in led to any action taken by the District. As there are no plausible allegations that connect Porter's role as a citizen to the speech at issue or any causal connection between any protected speech

9

and actions taken by the District, her First Amendment claim fails.

**B. Hostile Work Environment**

Defendants in their memorandum of law address Plaintiff's failure to plead a hostile work environment claim despite her failure to enumerate such a claim as a separate cause of action. Defs' Mem. at 14. In opposition, Porter argues that she was "subjected to a series [of] incidents which, taken together amount to a hostile work environment." Plaintiff's Memorandum of Law in Opposition ("Pl. Opp.") at 15, DE [27]. Hostile work environment claims can be based on the ADEA, Title VII, §1981, and/or the Equal Protection Clause of the Fourteenth Amendment and are analyzed using the same standards. *See Littlejohn v. City of New York,* 795 F.3d 297, 320 (2d Cir. 2015); *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003); *Harewood v. New York City Dep't of Educ.,* No. 18-cv-5487, 2019 WL 3042486, at *4 (S.D.N.Y. May 8, 2019), *adopted by* 2019 WL 2281277 (S.D.N.Y. May 29, 2019).

To establish a hostile work environment claim, a plaintiff "must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 723-24 (2d Cir. 2010) (stating similar standard for hostile work environment claim under §1981). To determine hostility or abusiveness of an environment, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295

(1993). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

The series of incidents cited by Porter in her opposition papers is as follows: (1) after complaining about reading program reductions, she was "required" to write a reflective statement in which she restated her complaints; (2) Strong "cautioned" her about her choice of a word in her statement; (3) Strong did not acknowledge Porter's accomplishments but rather praised a Caucasian colleague for Porter's work; and (4) she was transferred and then told her duties would be split between two buildings. Pl. Opp. at 15. The preparation of the reflective statement was apparently required in prior years and imposed on all staff members, *see* AC ¶21, and thus cannot be deemed to have been a task for which Porter was singled out. None of the other incidents, taken either separately or a whole, come remotely close to plausible allegations of pervasive, severe behavior rising to the level of a hostile work environment. Aside from Strong's "caution" regarding her reflective statement, the only other comment allegedly made by him to Porter was when he told her to "just accept" the situation regarding the changes in the scheduling that left her with little student contact. In addition, the allegations in the complaint occurred over the period of time from 2012 until June 2016. Without temporal markers, the alleged incidents appear as isolated events and not part of a continuous effort of any sort. As will be discussed *infra,* the circumstances around her reassignment also lack factual context. The amended complaint fails to allege facts sufficient to state a plausible hostile work environment claim.

## C. Employment Discrimination

To plead a claim for discrimination under either the ADEA or Title VII, a plaintiff must

allege that (1) she was a member of the protected class; (2) she was qualified for the employment position she held; (3) she suffered an adverse suffered employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Caskey v. Cty. of Ontario,* 560 F. App'x 57, 58 (2d Cir. 2014) (summary order); *Littlejohn,* 795 F.3d at 311. However, the causation standards for the two claims differ. A plaintiff may prevail under Title VII by proving that discrimination was a motivating factor for the adverse employment action, *see Littlejohn,* 795 F.3d at 311, while the ADEA requires proof that age was the "but-for" cause of the adverse employment action. *See Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); *Gorzynski.* 596 F.3d at 106.

Defendants do not dispute that Porter, a 55-year old African American woman, was a member of the protected classes, nor do they argue that she was unqualified for her position. Instead, they argue that she did not suffer an adverse employment action and that there are no allegations that support an inference that any action taken by the District was for any discriminatory reason.

1. Adverse Employment Actions

The Second Circuit has defined an adverse employment action "as a materially adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). While determination is case specific, examples of such changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotation marks, citations, and ellipses omitted), or refusal to hire, refusal to promote,

or reprimand, or "lesser actions" such as negative evaluation letters, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, or transfer from library to classroom teaching as an alleged demotion. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (citations omitted).

### a. Building reassignments

Plaintiff claims that the decision to reassign her to a new building followed shortly by the decision to split her time at two buildings constituted adverse employment actions. "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citation omitted). Plaintiff cites law supporting the concept that a transfer can constitute an adverse employment action in various circumstances such as: where an employee is transferred from a position of "prestige" to a lesser position, *Burlington N. & Santa Fe Railway Co. v. White,* 548 U.S. 53, 71, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); transfer resulted in a less distinguished title and diminished responsibilities, *Brady v. WalMart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008). While a transfer certainly could be an adverse employment action, the alleged complaint here is devoid of any factual allegations that suggest that the transfer in this case was materially adverse. Initially, there are no allegations regarding who made the decision, only that Assistant Superintendent O'Farrell informed her of the first transfer order. The amended complaint provides no allegations regarding the effect of the reassignment on her salary, benefits, title, or responsibilities, or anything else that would support an inference that Porter's transfer was an adverse employment action. Instead, she alleges in conclusory fashion that the assignment was a "positional demotion." In her opposition papers, the only "material alteration" identified by Plaintiff is that her employment "was

13

materially altered for the worse when she was mandated to, despite her seniority and certifications to transfer to a diffe[r]ent school and then advised that her time would be split between two (2) different schools within the district." Pl. Opp. at 12. Her suggestion that the decision to reassign her may have been unfair or unwarranted does not rise to the level of plausibility necessary to plead that the decision constituted an adverse employment action.

   b.   *Constructive Discharge*

Plaintiff also alleges that her decision to retire under these circumstances constituted a constructive discharge, another recognized form of adverse employment action. A constructive discharge occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Morris v. Schroder Capital Mgmt. Int'l,* 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted). A constructive discharge claim has two basic elements—proof that plaintiff "was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and proof that "he actually resigned." *Green v. Brennan*, -- U.S. --, 136 S. Ct. 1769, 1777 (2016) (citing *Pa. State Police v. Suders*, 542 U.S. 129 (2004)). A constructive discharge occurs only where the employer deliberately created intolerable working conditions and not where "the employee was dissatisfied with the nature of his assignments, or because his work was unjustly criticized, or where the working conditions were difficult or unpleasant." *Chizman v. Nassau Bd. of Coop. Educ'l Servs.,* 14-CV-5910, 2015 WL 13721528, at *6 (E.D.N.Y. Aug. 20, 2015) (citing *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360-61 (2d Cir. 1993)). Plaintiff has failed to allege any facts that plausibly suggest a working condition that was so difficult or intolerable that a reasonable person in her situation would be compelled to resign.

14

Porter alleges that because of "the ongoing and continuous maltreatment and unwanted alteration in her essential job functions," she was forced to retire. AC ¶30. The only alterations in how she performed her job appear to be attributable to the districtwide changes to the reading program and were not specific to her. To the extent she was unhappy with the reassignment, such dissatisfaction does not, by itself, support a constructive discharge claim. *See Chizman,* 2015 WL 13721528, at *7; *see also Caskey,* 560 F. App'x at 59 (affirming dismissal where complaint was "bereft of allegations" to render assertions that she was forced to retire plausible and there were no allegations that changes to work responsibilities "materially increased or significantly diminished her responsibilities, much less that those changes made her position intolerable, thereby coercing her into retirement"). In addition, there are no allegations that she was threatened with termination or a reduction of salary. *See, e.g., Morris v. N.Y.C. Dep't of Sanitation,* No. 99-CV-4376, 2003 WL 1739009, at *5 (S.D.N.Y. Apr. 2, 2003) (prima facie constructive discharge claim pled where plaintiff was told to retire or have his salary reduced by $25,000); *Doria v. Cramer Rosenthal McGlynn Inc.,* 942 F. Supp. 937, 947 (S.D.N.Y. 1996) (noting that the "most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge").

Moreover, a hostile environment constructive discharge claim has been described as "graver . . . than its lesser included component, hostile work environment." *Suders,* 542 U.S. at 149. Porter's failure to allege sufficient facts to state a plausible claim for a hostile work environment claim, as discussed *supra,* necessarily results in the failure to successfully plead a constructive discharge claim. *See Harewood,* 2019 WL 3042486 at *7 ("[b]ecause Plaintiff has failed to allege facts sufficient to state a plausible claim of hostile work environment, she likewise has failed to state a claim of constructive discharge."); *see also Chenette v.Kenneth Cole*

*Prods., Inc.* 345 F. App'x 615, 620 (2d Cir. 2009) (as plaintiff failed on her hostile work environment claim, summary judgment also appropriate on constructive discharge claim "which requires evidence of even more severe conditions").

  2. <u>Causal Connection</u>

  Even assuming *arguendo* that Porter had adequately pled an adverse employment action, there are absolutely no factual allegations that establish a causal connection between any action taken by Defendants and any impermissible intent on their part. Plaintiff cites her belief that younger, Caucasian teachers that she was "continually passed over in favor of younger, Caucasian" teachers. She even identifies three who were "repeatedly pushed ahead" of her. Beyond their names and these generalized comments, the amended complaint contains no specific allegations as to when these actions occurred, what positions they were allegedly given, whether she had applied for those positions, and what made her believe that any decision was made in any way based on her age or race. There are no factual allegations that Strong or any other District employee ever discussed Porter's age or race or considered either characteristic in any decision. As such, the amended complaint fails to plausibly allege that Porter's age was the but-for cause of any action taken against her, or that her race was a motivating factor in any decision made by the District concerning her employment. *See, e.g. Graham v. Watertown City Sch. Dist.,* No. 7:10-CV-756, 2011 WL 1344149, at *6 (N.D.N.Y. Apr. 8, 2011) (dismissing ADEA claim in which plaintiff alleged she was, *inter alia,* assigned to two-buildings as part of effort to encourage her to retire, and finding allegations to be "wholly conclusory" as there "is no indication that these actions would not have been taken but for plaintiff's age . . . no factual allegations that defendants ever discussed or considered plaintiff's age . . . [and] nothing in the amended complaint on which to base an inference that defendants intended to force [plaintiff]

16

into retirement due to her age").

**D.  Equal Protection**

Porter alleges that the "actions and mistreatment" of her by Defendants violates the Equal Protection Clause of the 14th Amendment "because such acts were taken in accordance with defendants' custom or practice of discriminating and/or selectively treating individuals." AC ¶37.  It is unclear whether she is asserting that she was discriminated against because of her membership in a protected class or whether she is asserting a "class of one" claim in which she alleges that she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam).  Her papers in opposition provide no clarity on this point as the argument is limited to three (3) sentences.  Pl. Opp. at 22.  The Amended Complaint fails to state a plausible claim in any event.

"[E]qual protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy."  *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012).  Instead, it is well established that "'[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S. Ct. 555, 50 L.Ed.2d 450 (1977)).  A plaintiff must allege that a defendant "expressly classified on the basis of a suspect characteristic, applied a neutral program in an intentionally discriminatory manner, or promulgated a policy that was motivated by discriminatory animus and that had an adverse effect." *Morales v. New York*, No. 13 Civ. 2586, 2014 WL 2158979, at *13 (S.D.N.Y. May 22, 2014) (citations omitted).  "[C]onclusory allegations of disparate treatment" and "personal

opinion that such treatment was motivated by discriminatory intent" are insufficient to state a § 1983 claim for an Equal Protection Clause violation. *Id.* at *14. Aside from her conclusory allegation that Caucasian colleagues were favored in unspecified ways, Plaintiff failed to plead any facts tending to show intentional discriminatory animus.

Furthermore, as the discriminatory intent must be possessed by an individual, "liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose." *Reynolds*, 685 F.3d at 204. The allegations in the amended complaint of personal involvement of any individual are few and far between. Strong is alleged to have taken only the following specific actions: (1) he told Porter to "just accept" that she would have decreased student contact; (2) he wrote the cover letter sent to staff members regarding the parameters for the annual reflective statement; (3) he ignored Porter's corrective suggestions made in her reflective statement; (4) he did not speak directly to Porter regarding her statement, but wrote a long statement "cautioning" her and placed it in her personnel file; and (5) he did not acknowledge Porter's accomplishments but rather praised a Caucasian teacher for Porter's work. The only other specific conduct alleged against an individual is attributed to Assistant Superintendent O'Farrell, who is not a named defendant, who allegedly (1) commented at some unspecified time and in some undesignated context, that "if the teachers are any good, the students would come"; (2) advised Porter in April 2016 that she would be transferred to another building. None of these allegations support an inference that either Strong or O'Farrell engaged in intentional discrimination.

Finally, the amended complaint fails to sufficiently identify any similarly situated persons who were treated differently than Porter. *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) (to establish intentional or purposeful discrimination, "it is axiomatic that a plaintiff must

allege that similarly situated persons have been treated differently"). She makes bald assertions that she was "continually passed over" in favor of younger, less experienced, Caucasian teachers, and identifies three such individuals who, upon information and belief, were "repeatedly pushed ahead" of her. AC ¶26. Again, however, there is not a shred of factual enhancement given in support of these statements, nor are there allegations suggesting that the three specified individuals were similarly situated to her in all material respects. For the foregoing reasons, Porter's claim of intentional discrimination is dismissed.[3]

## E. Leave to Amend[4]

Leave to amend a complaint "should be freely given when justice so requires," FED. R. CIV. P. 15(a)(2), but whether to grant or deny leave to amend lies in the sound discretion of the court. *See McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007). Where a plaintiff does not request leave to amend, the court may *sua sponte* decline to give leave to amend. *See Bright-Asante v. Wagner,* No. 15-CV-9110, 2017 WL 6948359, at *10 (S.D.N.Y. Dec. 1, 2017). As the Second Circuit has held, "[w]hile leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' . . . no court can be said to have erred in failing to grant a request that was not made." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013)

---

[3] The amended complaint also references an intentional race discrimination claim under 42 U.S.C. § 1981 that is not addressed in the papers. However, as proof of intentional discrimination is also required for a § 1981 claim, any such claim fails for the same reasons as her equal protection claim. *See Patterson v. Cty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir. 2004) ("[A] plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional."); *Brown v. City of Oneonta, New York,* 221 F.3d 329, 339 (2d Cir. 2000) ("plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause").

[4] As the motion to dismiss the federal claims is granted, the Court declines to address Strong's additional argument that he is entitled to qualified immunity.

(quoting *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011)); *see also Malgieri v. Ehrenberg*, No. 12-CV-2517, 2012 WL 6647515, at *9 (S.D.N.Y. Dec. 21, 2012). ("a district court has no obligation to grant leave to amend *sua sponte"*)

Plaintiff has been represented by counsel throughout this litigation and has already amended her complaint once. Although she had the benefit of the Defendants' view of the pleading deficiencies upon receipt of their motion to dismiss the original complaint, she made no effort to address these issues in the amended complaint. *See e.g., Brown v. Cerberus Capital Mgmt., L.P.,* 703 F. App'x 11, 15 (2d Cir. 2017) (summary order) (no abuse of discretion in denying amendment where a plaintiff "enjoyed a full opportunity to amend, having been apprised of Defendants' views of the original complaint's shortcomings"). In addition, she has not made a request, formal or informal, to further amend, did not cross move for lead to amend, and has not provided a proposed second amended complaint or presented any proposed factual enhancements. As Plaintiff has not evidenced a desire to replead much less provided any indication that repleading would cure the deficiencies discussed above, dismissal of the matter is with prejudice.

## F. Supplemental Jurisdiction

A court may decline to exercise supplemental jurisdiction over state law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367 (c)(3). The decision whether to exercise supplemental jurisdiction is discretionary. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018). Upon consideration of all relevant factors, and balancing the issues of judicial economy, convenience, fairness, and comity, this Court declines to exercise supplemental jurisdiction over the remaining claims. Accordingly, any state law claims asserted by plaintiff are dismissed without prejudice pursuant to 28 U.S.C. §

1367(c)(3).

## IV. CONCLUSION

Defendants' motion [27] is granted.  The Clerk of the Court is directed to close the case.

SO ORDERED.


___/s/_____
Sandra J. Feuerstein
United States District Judge


Dated: Central Islip, New York
September 26, 2019